**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

TRACIE F.,

      **Plaintiff,**

v.                                             Civil Action 3:24-cv-41
                                                    Judge Michael J. Newman
                                                    Magistrate Judge Kimberly A. Jolson

**COMMISSIONER OF
SOCIAL SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Tracie F., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI"). For the following reasons, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** the case to the Commissioner and the ALJ under Sentence Four of § 405(g).

**I.    BACKGROUND**

Plaintiff previously filed an application for Disability Insurance Benefits, which was denied initially and on reconsideration. (*See* R. at 85 (describing this application)). After a hearing at Plaintiff's request, the ALJ determined that Plaintiff was not disabled prior to her last-insured date of July 12, 2016. (*Id.* at 85–94). Seemingly, Plaintiff did not appeal this decision.

Plaintiff filed her current application for SSI on June 30, 2021, alleging that she was disabled beginning June 4, 2021, due to bipolar disorder, high blood pressure, torn shoulder, wrist and hand issues, hip freezes, leg and feet swelling, and back pain. (R. at 249–255, 310). After her application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a hearing in part by telephone on March 20, 2023. (R. at 36–81). Ultimately, the ALJ denied benefits

in a written decision on April 13, 2023. (R. at 14–35). When the Appeals Council denied review, that denial became the Commissioner's final decision. (R. at 1–6).

Next, Plaintiff brought this action. (Doc. 1). As required, the Commissioner filed the administrative record, and the matter is ready for review. (Docs. 7, 10, 11, 12).

### A. Relevant Hearing Testimony

Because the ALJ did not discuss Plaintiff's administrative hearing testimony at all, the Undersigned summarizes Plaintiff's relevant statements. (*See* R. at 14–35 (not citing Plaintiff's testimony once)).

To begin, Plaintiff testified that while she has a valid driver's license, she does not drive. (R. at 45 (discussing that her car is broken)). Plaintiff also said that she tries "to do everything by delivery when [she] can and [does] not go out" because of her difficulties interacting with others. (*Id.*). Additionally, Plaintiff struggled to answer questions about her work history and attributed her memory issues to a learning disability. (*Id.* at 47, 50–51 (explaining that she has "trouble recalling the past" due to her learning disability)). Plaintiff also said she believed she was sober for approximately six months in 2020. (R. at 50–51).

When asked about her employment with Subway, Plaintiff testified she was fired from that job. (R. at 49). When asked if she was using drugs at that time, she replied, "I had to." (*Id.*). Plaintiff explained that during that time, she was working 20-hour shifts and used methamphetamines "[p]retty much every time I had to work because I knew I had to do 20 hours at a time." (R. at 50). These long shifts began within one month of Plaintiff starting her employment at Subway. (*Id.*). Eventually, Plaintiff says she was fired due to complaints "because [she] wasn't getting a break and [she] walked away from the constant line [of customers] that came in." (R. at 51). To that end, Plaintiff further testified that she had "trouble" performing her job

2

duties even when she was sober. (*Id.* (explaining her good mood did not "last long," perhaps only a day)). She noted that with the constant line of customers, she had trouble standing for 10 hours without a break. (R. at 52). Plaintiff also agreed that she could not keep up with the pace of the work. (R. at 56).

For her physical health conditions, Plaintiff explained that she was not receiving treatment because she does not "like people," does not want "to be poked at," and lost her primary doctor. (R. at 52). Regarding her substance use, she testified she used methamphetamines "off and on." (R. at 52–53). At the time of the hearing, Plaintiff said she was "doing it because I'm bored. I'm lonely. I'm depressed. And I really want to stop." (R. at 53).

Turning to her mental impairments, Plaintiff testified at the hearing that she was not seeing her therapist because she could not afford to buy a bus pass. (*Id.*). As a result, Plaintiff was not taking any mental health medications at that time. (*Id.*). Plaintiff said this lack of treatment caused her to go to the hospital in February 2023. (*Id.*). Plaintiff also discussed that her medication can "build up" and cause suicidal ideations. (*Id.*). While Plaintiff testified that she used to color, sew, paint, and garden, she said that since her depression worsened, she cannot do any of her former hobbies. (R. at 62). Plaintiff stopped her mental health treatment in August 2022 because she "gave up" and believed that "nobody cared." (R. at 63).

In sum, when asked how she spent a typical day, Plaintiff testified:

> Well, I'm pretty much have been a third-shifter since I was, you know, since I started working in life. So, I'm a night person. And I get up at noon to watch my soap operas. That's the, probably the only consistent thing I've done for 48 years and smoke cigarettes and watch Young and the Restless. But, just taking care of myself, cleaning my house and I have three cats. And everything's a struggle, you know. I do my doctor appointments every three months. It's all I can do to keep up with my own self, laundry, dishes because of my depression.

(R. at 54).

3

**B.     Relevant Medical Evidence**

The ALJ discussed Plaintiff's mental health impairments and the "paragraph B" criteria as follows:

> In understanding, remembering, or applying information, [Plaintiff] has a moderate limitation. In August 2021, [Plaintiff] was remarked to have been able to successfully complete an unemployment application as well as weekly reports for job searches (Exhibit B2F). [Plaintiff] is remarked to complain of forgetfulness (Exhibit B4F). However, there are no abnormal findings in memory noted in the record.
>
> In interacting with others, [Plaintiff] has a moderate limitation. [Plaintiff] reported being let go from her job at Subway for having too many complaints (Exhibit B2F at 6). During the alleged period of disability, [Plaintiff] was able to reconnect with her daughter and ultimately go visit her (Exhibits B1F at 30; B11F at 549). [Plaintiff] reported in February 2023, when she feels abandoned, she experiences suicide ideation (Exhibit B9F at 16).
>
> With regard to concentrating, persisting, or maintaining pace, [Plaintiff] has a moderate limitation. [Plaintiff] has been diagnosed and prescribed medications for major depressive disorder and chronic PTSD (Exhibits B1F; B11F). In addition to these impairments, [Plaintiff] is also noted to struggle with polysubstance abuse, alcohol abuse, and cannabis use disorder (Exhibits B1F; B3F; B8F; B9F; B11F). As part of her care plan, [Plaintiff] would decrease marijuana and alcohol consumption (Exhibit B2F at 4; B4F at 4; B5F at 4; B6F at 4). Despite her impairments, [Plaintiff] has been able to work essentially part time hours at a fast-food restaurant (Exhibit B1F at 26). Eventually she was let go. While working at subway [Plaintiff] is noted to report becoming overwhelmed and struggling to keep up (Exhibit B4F at 8). Drug use interferes with her ability to sleep (Exhibits B6F at 15; B11F at 748). However, [Plaintiff] watches a soap opera daily, and in fact had to turn an alarm off during her hearing with the undersigned, alerting her to the start of said program.
>
> As for adapting or managing oneself, [Plaintiff] has experienced a moderate limitation. As discussed above, [Plaintiff] is noted to struggle with polysubstance abuse. There are multiple relapses noted in the record (see Exhibits B1F at 25; B11F at 563, 633). Additionally, [Plaintiff] is remarked to be noncompliant with her medication (Exhibits B1F at 26, 34; B11F at 534, 563, 700). While working, [Plaintiff] reported that it was going well, she loves working, and loves her boss (Exhibit B1F at 34; B11F at 534). She complains of depression, primarily seasonal with symptoms including crying spells, becoming very depressed as it gets colder; history of abusive relationships; and alcohol and marijuana use regularly (Exhibit B4F at 8). Mental status examinations of record are essentially normal except for occasional notes of abnormal mood and/or affect (Exhibits B4F; B6F). [Plaintiff]

4

> does complain of fatigue (Exhibit B4F). Complaints of fatigue and forgetfulness may be related to hypothyroidism since [Plaintiff] is noted in the record to not be compliant with medication (Exhibit B11F at 710). When compliant with medications, [Plaintiff] reports doing well (Exhibit B11F at 798).
>
> [Plaintiff] had a psychiatric admission on February 2 and February 3-6 for suicidal ideation (Exhibits B8F at 2; B9F at 8). At this time, she self-discontinued medication (Exhibit B9F at 16). During the admission, [Plaintiff] tested positive for amphetamines and has a history of stimulant use disorders (methamphetamine and cocaine). The undersigned notes that within the treatment notes it is remarked that "it is difficult to fully differentiate her current symptoms from substance-induced mood disorder or mania" (Exhibit B9F at 17). Additionally, [Plaintiff] is remarked to not been following up with her psychologist or taking any of her depression medications (Exhibit B8F at 20).
>
> \*\*\*
>
> The undersigned has taken into consideration the wellness check evidence submitted and exhibited as Exhibit B18E. The undersigned finds this evidence to have minimal persuasive value. Within the record, [Plaintiff] is remarked to display the same types of behaviors, which has led to only one short psychiatric hospitalization during the period under adjudication and is related to her drug use (see Exhibit B9F). Outside of this one-time incident, there is no other evidence of psychiatric hospitalization.

(R. at 22–23, 28).

### C. Relevant Medical Opinions

The ALJ summarized the opinion of Plaintiff's treating physician, Dr. Molly J. Hall, as follows:

> A Mental Functional Capacity Assessment dated March 2, 2023, was completed by [Plaintiff's] treating physician Molly J. Hall, M.D., who opined that [Plaintiff] had marked limitations in each of the paragraph b criteria areas. Dr. Hall noted that she treated [Plaintiff] since 2017 and at the time of completing this form, she last examined [Plaintiff] on February 15, 2022, deterioration is noted with methamphetamine. [Plaintiff] was reported to be unable to function reliably in any employment situation as she is unable to maintain a schedule/structure with consistency, focus, or task completion (Exhibit B12F). This opinion is found to be minimally persuasive. According to Dr. Hall's report, she has not examined [Plaintiff] for thirteen months, which is a large portion of the adjudication period. Additionally, she asserts that [Plaintiff's] deterioration is primarily due to her drug use. It is unclear what [Plaintiff's] capacity to function is when she is sober as Dr. Hall simply states that [Plaintiff] has significantly severe mental impairments but

5

> offers no signs or symptoms or clinical objectives to support her assertion. Despite her medical specialty, treating relationship with [Plaintiff], length of treating history, and the testing and treatment conducted, the undersigned finds the opinions of Dr. Hall to be inconsistent with the evidence of record and unsupported by the objective evidence of record.

(R. at 28).

### D. The ALJ's Decision

The ALJ found that Plaintiff has not engaged in substantial gainful activity since June 30, 2021, the application date. (R. at 19). The ALJ determined that Plaintiff suffers from the following severe impairments: hypertension (HTN); myalgia; hepatitis C; mild cervical and lumbar arthritic changes with scoliosis; bilateral shoulder arthralgias; depressive disorder; bipolar disorder; post-traumatic stress disorder (PTSD); alcohol abuse; polysubstance abuse; and cannabis use disorder. (*Id.*). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, meet or medically equal a listed impairment. (R. at 20).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

> [Plaintiff] has the residual functional capacity to perform medium work as defined in 20 CFR 416.967(c) except she can: lift/carry 25 pounds frequently and 50 pounds occasionally; sit/stand/walk 6 hours in an 8-hour workday; frequently climb ramps or stairs; occasionally climb ladders, ropes, or scaffolds; frequently balance/stoop/kneel/crouch/crawl; frequently reach overhead with bilateral upper extremities; perform unskilled simple routine repetitive tasks; unable to perform at a production-rate pace (e.g., assembly line work) but can perform goal-oriented work (e.g., office cleaner); occasional superficial contact with coworkers and supervisors but no teamwork, tandem tasks, conflict resolution or over-the-shoulder supervision; "superficial contact" is defined as retaining the ability to receive simple instructions, ask simple questions, and receive performance appraisals but as lacking the ability to engage in more complex social interactions such as persuading other people or rendering advice; no contact with the general public as part of job duties; and occasional changes in an otherwise routine work setting explained in advance to allow time for adjustment to new expectations.

(R. at 23).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record." (R. at 24).

Relying on the vocational expert's testimony, the ALJ found Plaintiff unable to perform her past relevant work as a pizza baker, sandwich maker, and a composite job consisting of a cashier and stock clerk. (R. at 28–29). Further relying on the vocational expert's testimony, the ALJ concluded that Plaintiff could perform light exertional, unskilled jobs that exist in significant numbers in the national economy, such as a laundry worker, floor waxer, or dish washer. (R. at 29–30). She concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act, since June 30, 2021, the date the application was filed (20 CFR 416.920(g))." (R. at 30).

## II. STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Olive v. Comm'r of Soc. Sec.*, No. 3:06-cv-1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing 42 U.S.C. § 405(g)); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

**III. DISCUSSION**

Plaintiff raises several assignments of error, (Doc. 10 at 1), but the first decides the day. Plaintiff contends the ALJ erred by attributing Plaintiff's limitations to substance use prior to making an initial finding of disability. (*Id.* at 9–13). The Undersigned agrees.

Substance use alone cannot be a basis for a disability finding. *See* 42 U.S.C. § 423(d)(2)(C) ("An individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled."). As a result, Social Security regulations require ALJs to follow a sequential process when substance use issues arise. First, the ALJ must consider all the claimant's impairments, including substance abuse disorders, and determine whether the claimant is disabled. *See* 20 C.F.R. § 416.935(a), 20 C.F.R. § 404.1535. If the ALJ concludes the claimant is disabled, only then may she consider whether substance abuse is a "material factor" contributing to the disability. 20 C.F.R. § 416.935(a) ("The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol."). As other courts have recognized, "[t]he implementing regulations make clear that a finding of disability is a condition precedent" to determining whether substance use would be a "contributing material factor to the determination of disability." *Williams v. Barnhart*, 338 F.Supp.2d 849, 862 (M.D. Tenn. 2004) (internal quotation omitted).

Here, the ALJ found that Plaintiff's substance and alcohol use were severe impairments at Step Two. (R. at 19 (finding Plaintiff had severe impairments of "alcohol abuse, polysubstance abuse; and cannabis use disorder")). In crafting Plaintiff's RFC, the ALJ said she attempted to "give [Plaintiff] the full benefit of the record" and "fully address the severity of [Plaintiff's]

8

combination of polysubstance abuse and mental impairments." (R. at 27). But other parts of the ALJ's decision demonstrate that she did not adhere to the process outlined above.

To start, nowhere in her opinion did the ALJ cite the controlling regulations. *Major v. Astrue*, No. 1:10-cv-530, 2011 WL 3566778, at *7 (S.D. Ohio June 30, 2011) (finding that the ALJ's failure to cite the DAA regulations was "'not a mere drafting oversight, but accurately reflected his failure to follow the procedures prescribed there'" (quoting *Brueggemann v. Barnhart*, 348 F.3d 689, 694 (8th Cir. 2003))), *report and recommendation adopted sub nom Major v. Comm'r of Soc. Sec.*, No. 1:10-cv-530, 2011 WL 3566619 (S.D. Ohio Aug. 12, 2011). And the ALJ's failure to recognize the applicable procedures permeates her reasoning. At multiple points in her decision, she improperly considered Plaintiff's substance abuse as the source of her limitations or used Plaintiff's drug and alcohol use to minimize the severity of her symptoms.

For example, at Step Three, while discussing Plaintiff's mental health symptoms, the ALJ noted that "within the treatment notes it is remarked that 'it is difficult to fully differentiate [Plaintiff's] current symptoms from substance-induced mood disorder or mania.'" (R. at 22 (citing R. at 660)). At this point, though, the ALJ should not have attempted to "differentiate" whether Plaintiff's symptoms were caused by substance use or her mental impairments. (*Id.*); *see Brooks v. Comm'r of Soc. Sec.*, No. 1:11-cv-567, 2012 WL 3966270, at *15 (S.D. Ohio Sept. 11, 2012) (remanding where the ALJ "improperly conflated the sequential analysis by considering plaintiff's substance abuse issues prior to making a determination of disability"), *report and recommendation adopted*, No. 1:11-cv-567, 2012 WL 4757836 (S.D. Ohio Oct. 4, 2012).

Similar errors pervade the ALJ's analysis at Step Four. First, when discussing Plaintiff's physical impairments, the ALJ wrote that "the evidence of record simply does not show a frequency of treatment or severity of symptoms, with or without drug use, that would infer that [Plaintiff] is

9

disabled." (R. at 25). Next, the ALJ considered a wellness examination conducted at a hospital in February 2023. (R. at 28 (discussing R. at 644–86)). In finding this examination "unpersuasive," the ALJ noted that Plaintiff has displayed "the same types of behaviors . . . during the period under adjudication" and found those behaviors were "related to her drug use." (*Id.*). Lastly, the ALJ analyzed a mental functional capacity assessment provided by Plaintiff's treating physician, Dr. Molly J. Hall. The ALJ wrote that Dr. Hall determined Plaintiff's "deterioration [in 2023 was] primarily due to her drug use" and that "[i]t is unclear what [Plaintiff's] capacity to function is when she is sober[.]" (R. at 28 (citing R. at 1538–39)). But the ALJ appears to have misread Dr. Hall's opinion. (R. at 28). Dr. Hall said that Plaintiff was using substances, but she did not attribute Plaintiff's deterioration "primarily" to her relapse. (*See* R. at 1538–39). Instead, Dr. Hall wrote that Plaintiff was "using methamphetamine again and has been more depressed, suicidal . . . with paranoid, psychotic ideation[s]." (*Id.* at 1539). Plainly, these statements do not attribute Plaintiff's medical issues primarily to either her mental health conditions or her substance use. (*Id.*). And again, at this stage of her analysis, the ALJ should have been considering Plaintiff's limitations as a whole, not discounting symptoms she could attribute to substance use. *Cf. Major*, 2011 WL 3566778, at *8 ("When drug and alcohol abuse play a role in symptoms, the *symptoms* or limitations, but not the cause, can and should be considered in making a determination of disability[.]" (emphasis in original)).

The Commissioner counters that these remarks (and others) simply show the ALJ properly considered evidence of Plaintiff's substance use. (Doc. 11 at 5–7 (citing R. at 22–23, 25, 28)). But the issue is not whether the ALJ considered Plaintiff's substance use at all. Rather, the issue is whether the ALJ considered evidence of Plaintiff's substance use according to the proper sequential

10

process. *See Williams*, 338 F.Supp.2d at 862–63 (describing the two-step procedure required when substance abuse issues arise). She did not.

Sometimes, the ALJ considered substance use as a possible cause of Plaintiff's mental health symptoms and found certain evidence unpersuasive as a result. (R. at 28 (discounting a wellness examination and attributing Plaintiff's behaviors to substance use)); *see Morrison v. Comm'r of Soc. Sec.*, No. 1:13-cv-722, 2014 WL 7409752, at *9 (S.D. Ohio Dec. 31, 2014) (finding reversible error where the ALJ "improperly deducted the assumed effects of plaintiff's alcohol abuse . . . by concluding that plaintiff's alcohol abuse was the cause of her decompensations"). At other points, the ALJ seemingly concluded that Plaintiff's substance use minimized the severity of her symptoms. (R. at 28 (finding Plaintiff's deterioration in 2023 and Dr. Hall's opinion less compelling and attributing her symptoms to a relapse)); *see Major*, 2011 WL 3566778, at *8 (remanding where the ALJ discounted symptoms and minimized their severity based on substance use). More still, the ALJ's statements suggest she believed she could consider Plaintiff's abilities only while sober in determining whether Plaintiff was disabled. (R. at 28 (noting, when considering Dr. Hall's opinion, that "[i]t is unclear what [Plaintiff's] capacity to function is when she is sober")); *see, e.g.*, *Lynch v. Comm'r of Soc. Sec.*, No. 1:12-cv-075, 2013 WL 264670, at *8 (S.D. Ohio Jan. 23, 2013) (noting the ALJ "improperly deducted the assumed effects of plaintiff's substance abuse in assessing the degree of mental limitation"), *report and recommendation adopted*, No. 1:12-cv-75, 2013 WL 588888 (S.D. Ohio Feb. 14, 2013). This shows that the ALJ did not follow the two-step process required by the controlling regulations. *Williams*, 38 F.Supp.2d at 862–63 ("[T]he language of § 404.1535 plainly requires the existence of a current disability determination before the substance use disorders are even considered." (internal quotations omitted)).

11

These errors are not harmless. The purpose of the sequential process is to protect against judicial bias, as "an ALJ with an inherent view of 'addiction as illness' may reach a radically different conclusion than an ALJ who views substance abuse issues as a 'lifestyle choice.'" *Major*, 2011 WL 3566778, at *8. By neglecting to follow the regulations, the ALJ thwarted this purpose and "put the cart before the horse." *Williams*, 338 F.Supp.2d at 862. What's more, because the ALJ neglected to follow the two-step process, the ALJ improperly evaluated Plaintiff's substance use issues at both Step Three and Step Four. For example, the ALJ seemingly minimized Plaintiff's mental health symptoms when she determined that substance use was the source of those symptoms. (*See* R. at 28 (finding hospital records and Dr. Hall's opinion unpersuasive because the ALJ determined Plaintiff's symptoms were related to substance use)). The ALJ also attempted to parse out the impact of Plaintiff's substance use when deciding the severity of her physical impairments. (R. at 25 (discussing Plaintiff uses substances to "self-medicate" and her symptoms are not severe enough "with or without drug use" for a finding of disability)). If the ALJ had followed the proper regulations, she may have found Plaintiff's impairments more severe or even disabling. (*See* Doc. 10 at 4 (discussing how additional lifting limitations would have limited Plaintiff to light work and led to a disability finding)).

In sum, the Undersigned agrees with other courts that these errors require remand. *See Major*, 2011 WL 3566778, at *7 ("It constitutes legal error to 'discount' impairments based upon substance abuse when calculating the 'gross' total of a claimant's limitations."); *Brooks*, 2012 WL 3966270, at *17 (concluding that failure to follow the applicable regulations was non-harmless, legal error); *Morrison,* 2014 WL 7409752, at *11 (same); *Williams*, 338 F.Supp.2d at 864–65 (finding the ALJ "failed to apply the correct legal standard" for evaluating a plaintiff's substance abuse issues and remanding). This is not to say the ALJ will ultimately find Plaintiff disabled. But

because the ALJ did not follow the controlling regulations, her decision lacks a proper disability determination, as well as the necessary factfinding and analysis of Plaintiff's limitations and symptoms. Consequently, the Commissioner's decision should be reversed and remanded for further proceedings.

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

### PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s). A District Judge of this Court shall make a *de novo* determination of those portions of the Report or specific proposed findings or recommendations to which objection is made. Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence, or may recommit this matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo* and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date:   September 4, 2024                                    /s/ Kimberly A. Jolson
                                                             KIMBERLY A. JOLSON
                                                             UNITED STATES MAGISTRATE JUDGE